USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/7/25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KAVASUTRA 6th STREET, INC. and
KAVASUTRA 10th STREET, INC.,

                              Plaintiffs,

                    -against-

ERIC ADAMS as MAYOR OF THE CITY
OF NEW YORK; the CITY OF NEW YORK;
MICHELLE MORSE[1] as COMMISSIONER
OF THE NEW YORK CITY DEPARTMENT
OF HEALTH AND MENTAL HYGIENE;
and the NEW YORK CITY DEPARTMENT
OF HEALTH AND MENTAL HYGIENE,

                              Defendants.

---

23-CV-6359 (VEC)

OPINION & ORDER

VALERIE CAPRONI, United States District Judge:

Plaintiffs operate cafés in Manhattan. They brought this action primarily seeking a declaratory judgment that Defendants, who enforce food safety laws against restaurants and other food service establishments in New York City, cannot "restrict, interfere or prevent [P]laintiffs' sale of Kava as a single ingredient food sold by itself or mixed with water." Am. Compl. ¶ 31, Dkt. 26. They also seek a permanent injunction preventing Defendants from interfering with their sale of kava either by itself or mixed with water. *Id.* ¶ 33.[2]

After some pretrial skirmishes,[3] the Court held a one-day bench trial on January 21, 2025,

---

[1]       At the time Plaintiff initiated this action, Ashwin Vasan was the Commissioner of the New York City Department of Health and Mental Hygiene ("Department of Health"). Dr. Michelle Morse is the current Acting Commissioner and Chief Medical Officer of the Department of Health. Under Fed. R. Civ. P. 25(d), the successor of a public officer is substituted as a party when the originally named public officer no longer holds the position.

[2]       They also assert a claim pursuant to 42 U.S.C. § 1983 for a violation of their due process rights. Am. Compl. ¶ 41.

[3]       Plaintiffs initially moved for a temporary restraining order ("TRO") and preliminary and permanent injunctions against Defendants to enjoin them from restricting, interfering or preventing "[P]laintiffs' sale of Kava as a food." *See* Compl. ¶ 32, Dkt. 1; Motion for Emergency Relief, Dkts. 6–9. The Court denied Plaintiffs' motion for a TRO on July 26, 2023, Dkt. 16, and denied their motion for a preliminary injunction on December 8, 2023,

to resolve the question whether kava, when mixed with water is, under the federal Food, Drug and Cosmetic Act ("FDCA"), a single-ingredient "food," and therefore presumed safe,[4] Sen. Rep. 103–410 at 21 (1994) ("Under present law . . . any food, is presumed to be safe."), or whether it is a "food additive," and therefore not presumed to be safe, 21 U.S.C. § 348.  For the reasons discussed below, the Court finds that Plaintiffs have not proved by a preponderance of the evidence that kava steeped in water is a single-ingredient food.  Accordingly, Plaintiffs are not entitled to a declaratory judgment or a permanent injunction.  Moreover, Plaintiffs have not proven that Defendants violated their due process rights.  In short, the Court finds in favor of Defendants on all claims.

Based on its observations of the witnesses, examination of the evidence, and the parties' briefing, the Court makes the following findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a).

---

Dkt. 36.  Plaintiffs appealed the denial of the preliminary injunction, and, on December 19, 2024, the Second Circuit affirmed.  *Kavasutra 6th Street Inc. & Kavasutra 10th Street, Inc. v. Adams et al.*, No. 24-15, 2024 WL 5165386 (2d Cir. Dec. 19, 2024).

[4]       In their Amended Complaint, Plaintiffs asserted that kava "served by itself or mixed with water is considered a food by the FDA."  Am. Compl. ¶ 15.  Plaintiffs have waived any claim related to kava sold on its own and not mixed with water to produce a beverage.  In the parties' joint pre-trial order, Plaintiffs asserted that: (i) they were seeking a declaratory judgment that "under the FDCA, Defendants may not restrict, interfere or prevent Plaintiffs' sale of Kava mixed with water;" (ii) they were seeking a permanent injunction preventing Defendants from restricting Plaintiffs' sale of kava mixed with water; and (iii) the "question of whether kava mixed with water constitutes a food or a food additive must be resolved at trial."  Joint Pre-Trial Order at 2–3, Dkt. 67.  There was no mention of kava sold on its own in the joint pretrial order.  Accordingly, Plaintiffs' initial claim that kava on its own is a food has been abandoned.  *See Loc. 282, Int'l Bhd. of Teamsters v. Pile Found. Constr. Co.*, No. 09–cv–4535, 2011 WL 3471403, at * 2 (E.D.N.Y. Aug. 5, 2011) (citations omitted) (holding that absent manifest injustice, "a party's failure to include a legal theory or defense in the pre-trial order results in its subsequent abandonment or waiver"); *Katt v. City of New York*, 151 F. Supp. 2d 313, 346 (S.D.N.Y. 2001), *aff'd sub nom. Krohn v. N.Y.C. Police Dep't*, 372 F.3d 83 (2d Cir. 2004) (accord); *Solinsky v. Arthritis Found.*, 635 F. Supp. 620, 622 (E.D.N.Y. 1986) (holding that claims alleged in the complaint but not listed as issues in the pretrial order were deemed abandoned).

I.    **FINDINGS OF FACT**

Kava (*Piper methysticum*) is a shrub that is native to Polynesia, Micronesia, and Melanesia.  Def. Ex. 1 at 2.  Kava beverages, which are made from the root of the shrub, have historically been consumed ceremonially and socially in the South Pacific.  *Id.*  Plaintiffs operate cafés on East First Street ("Kavasutra 6th Street") and on East Tenth Street ("Kavasutra 10th Street") in New York City.  Pl. Ex. 1–4.  At both cafés, Plaintiffs serve a beverage that consists of kava mixed with water.  *Id.*

The Department of Health oversees food service establishments in New York City (*i.e.*, restaurants/cafés).  Declaration of Genan Zilkha ("Zilkha Decl.") Ex. A Trial Transcript ("TT") at 26:3–4, Dkt. 80–1.  Under N.Y.C. Health Code, the Department of Health has the authority to determine what is an adulterant and to order establishments that serve adulterated food closed.  N.Y.C. Health Code § 71.05(c).  The Department looks to the FDCA to determine what is an adulterant.  *Id.*

A.  **The Food and Drug Administration Memorandum**

The Food and Drug Administration ("FDA") is the federal agency tasked with protecting public health by ensuring the safety of the country's food supply, and it fulfills that role by enforcing the FDCA.  *See What We Do*, U.S. Food & Drug Admin. (Nov. 21, 2023), https://www.fda.gov/about-fda/what-we-do.

On August 11, 2020, the FDA released a "Review of the published literature pertaining to the safety of Kava for use in conventional foods" (hereafter, "2020 Memo").  Def. Ex. 1.  The 2020 Memo was written by an FDA toxicologist.[5]  *Id.* at 1.  The 2020 Memo summarizes information about kava gathered from published literature and other sources.  It discusses,

---

[5]    The name of the author was redacted.

among other subjects, the chemistry of the kava root, and concerns about the hepatotoxic[6] properties of kava and its carcinogenic effects, and other adverse health effects associated with kava. *Id.*

Kava is banned in Germany, Switzerland, France, and Canada because ingesting it can cause liver toxicity. *Id.* at 15. The World Health Organization reviewed 93 cases of presumed kava-related hepatotoxicity and determined that there is a "significant concern of a cause and effect relationship between kava products and hepatotoxicity" and that co-medication with other potentially hepatotoxic drugs may lead to harm. *Id.* In 2002, the U.S. Centers for Disease Control and Prevention issued a report on hepatotoxicity associated with products containing kava. *Id.* at 17. On March 25, 2002, the FDA warned that kava may be linked to serious liver damage, including hepatitis and cirrhosis. *Id.*

After reviewing available data and information, the FDA noted that enough toxicological data exists to conclude that indiscriminate use of kava as a beverage "is not safe for human consumption." *Id.* at 21. Because "there is no food additive regulation in effect that provides for the safe use of kava as an ingredient in conventional foods," there is no "basis for such use to be considered as generally recognized as safe (GRAS)." *Id.* In order for a substance to be categorized as GRAS, experts qualified by scientific training and experience to evaluate the safety of substances added to food must generally recognize the intended use of the substance to be safe. *Id.* Thus, the FDA "considers kava an unapproved food additive when used as an ingredient in conventional foods." *Id.*

Plaintiffs assert that they sell kava "as a single ingredient served in water for ease of consumption" and that the "water is merely a vehicle for 'a means of ingestion.'" Pl. Mem. at 9,

---

[6]        Hepatotoxic effects refers to adverse effects on the liver.

Dkt. 78.   Although Plaintiffs' assertion that they sell kava mixed with water as a single ingredient food implies that they do not consider water to be a food, under the FDCA, water is a food.  21 U.S.C. § 321(f); TT at 22:16–17, 30:8–9.  *See Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 622 (4th Cir. 2015) ("The FDA regulates bottled water as a food[.]"); *Compliance Policy Guide Sec. 555.875 Water in Food Products (Ingredient or Adulterant)*, U.S. Food & Drug Admin., https://www.fda.gov/regulatory-information/search-fda-guidance-documents/cpg-sec-555875-water-food-products-ingredient-or-adulterant (1989) ("Water is a food as defined in section 201(f) of the Federal Food, Drug, and Cosmetic Act (21 USC 32l(f)).").  Plaintiffs presented no evidence that the 2020 Memo has been rescinded or superseded by any further guidance.  *See* TT at 60:13–17, 127:2–9.

## B.  The Department of Health's Position on Kava

### 1.   Communications with the FDA

Michelle Robinson, the Assistant Commissioner of the Bureau of Food Safety at the Department of Health, testified that she relied on the 2020 Memo, as well as the FDA's food additive database and GRAS substance database, to determine that kava is a food additive when steeped in water.  TT at 124:11–22, 148:23–149:2.

Corinne Schiff, Deputy Commissioner for environmental health of the Department of Health, testified that, in early 2024, she sought further guidance on kava from Elizabeth O'Malley, a Branch Director of the Division of Retail Food of the FDA (the "FDA Email").  TT at 17:20–21, 18:19–24; Pl. Ex. 5.  O'Malley responded: "[n]o use of kava or its derivatives has been approved as a food additive"; the FDA does "not consider its use in food to be GRAS"; "[i]f kava is steeped in water to brew tea it would not be considered a food additive, however [the FDA] still would NOT consider it safe"; and that "if kava is steeped in water to make tea

and then served with any sugar/flavor/literally anything else, it could be considered back in the unsafe food additive territory."  Pl. Ex. 5 at 4–5.  Schiff testified that she found O'Malley's email to be "imprecise" and not "determinative" as it raised more questions than it resolved.  TT at 38:15, 39:9–10.  O'Malley sent another email to Schiff, in which she reiterated her prior position that kava "is not approved for use in food as a food additive"; the FDA does "not consider its use in food to be GRAS"; "kava steeped in water to brew tea would generally not be regulated as a food additive – if it is only steeped in water and consumed as single-ingredient it is considered a conventional food . . . [h]owever, such use may present safety concerns."  *Id.* at 2.  Schiff testified that the additional information relayed by O'Malley was "very confusing."  TT 53:12–13.

For reasons that are unknown, Plaintiffs did not call as a witness anyone from the FDA to clarify its position.

### 2.  Enforcement Actions – Kavasutra 6th Street

On November 16, 2022, the Department of Health issued a summons to Kavasutra 6th Street after an inspector observed it selling kava mixed with water as a beverage in violation of N.Y.C. Health Code § 71.05.[7]  The summons asserted: "Food or beverage containing a

---

[7]    N.Y.C. Health Code § 71.05 provides:

> (a) No person shall . . . sell, offer for sale, deliver or give away any food . . . which is adulterated or misbranded.  A food . . . in the possession of, held, kept or offered for sale by any person shall, prima facie, be presumed to be held, kept or offered for sale for human consumption or use.

> (b)  No person shall adulterate or misbrand a food . . ..

> (c)  *Food deemed adulterated.* A food shall be deemed adulterated if the Department has determined the food to be adulterated or as set forth in the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 342) or the New York State Agriculture and Markets Law (§ 200) under circumstances including, but not limited to, any one or more of the following . . .

> > (4)  If the food is, bears or contains any food additive, it will be considered adulterated if it is unsafe within the meaning of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 348).

prohibited substance" was being "possessed, being prepared, processed, packaged, offered or served" and was "not Generally Recognized As Safe (GRAS) for use in food or is not an approved food colorant or food additive in accordance with the U.S. Food and Drug Administration (FDA)." Def. Ex. 7. The kava "was embargoed and [Kavasutra 6th Street] was given an opportunity to be heard by the Department." *Id.*

On July 13, 2023, the Department of Health returned to Kavasutra 6th Street and issued another summons for selling kava mixed with water in violation of N.Y.C. Health Code § 71.05. *Id.* On that same day, the Department of Health also issued a Closing Order. Def. Ex. 13.[8] Kavasutra 6th Street remained open for business in defiance of the Closing Order. TT at 133:8–11.

The N.Y.C. Office of Administrative Trials and Hearings ("OATH") held a hearing on July 28, 2023, regarding the summons issued on July 13, 2023, and dismissed the violations. Def. Ex. 9. The Department of Health appealed, and the OATH Appeals Division reversed, finding that Kavasutra 6th Street "did not dispute that Kava . . . [was] being offered as ingredients in beverages that were sold for customer consumption . . . in violation of [Health Code] § 71.05." Def. Ex. 11.

On September 19, 2023, the Department of Health found that Kavasutra 6th Street was continuing to operate in violation of the July 13, 2023 Closing Order and issued a second Closing Order. Def. Exs. 7, 13. Kavasutra 6th Street remained in operation in defiance of the second Closing Order. TT at 133:7–11. On October 4, 2023, OATH held a hearing on the

---

[8]    The Closing Order provided: "in accordance with Health Code § 81.39 (c) and. Sanitary Code § 14-1.194 (c) [Kavasutra 6th Street] be closed, that foods be discarded as instructed by [the Department of Health's] inspector and that [Kavasutra 6th Street] remain closed until [Petitioner has] presented proof that [Kavasutra 6th Street's] continued operation does not present a danger to public health and the [Department of Health] has authorized reopening." Def. Ex. 13.

September 19, 2023 summons; on October 4, 2023, OATH dismissed the summons.  Def. Ex. 9.

The Department of Health again appealed, and the OATH Appeals Division again reversed,

holding that the Department of Health had "established that kava . . . [is an] adulterant[] that [is]

prohibited from being added to food."  Def. Ex. 11.

### 3. Enforcement Actions – Kavasutra 10th Street

On August 22, 2022, the Department of Health ordered Kavasutra 10th Street to "cease

the . . . selling of kava[] commercially processed drinks."  Def. Ex. 8 ("Embargo Order").   On

January 4, 2023, the Department of Health inspected Kavasutra 10th Street and issued a

summons for violating the Embargo Order.  *Id.*  On January 11, 2023, the Department of Health

ordered Kavasutra 10th Street to close and to "cease and desist from . . . offering for sale . . . any

food or beverage containing . . . Kava."  Def. Ex. 14.  The Closing Order stated that under the

FDCA, kava is not GRAS and "is prohibited from being added to foods or beverages in a food

service establishment regulated by the Department [of Health]."  *Id.*

On July 12, 2023, the Department of Health inspected Kavasutra 10th Street, observed

that the menu included items containing kava, and issued another summons.  Def. Ex. 8.  The

Department of Health again ordered it to close, citing "imminent or public health hazards."  Def.

Ex. 14.  On July 21, 2023, the Department of Health again inspected Kavasutra 10th Street and

again found it to be operating in violation of the Closing Order; the Department of Health issued

another summons.  Def. Ex. 8.

On August 24, 2023, OATH held a hearing on the July 12, 2023 summons and dismissed

the violation.  Def. Ex. 10.  The Department of Health appealed, and the OATH Appeals

Division reversed.  Def. Ex. 12.

### C.  Plaintiffs' Experts

At trial, Plaintiffs presented the testimony of two experts, each of whom produced expert reports in advance of trial.  Dr. Steven Dentali has a Ph.D. in pharmaceutical sciences, has held several positions in the natural product industry, and produced a report ("Dentali Report") about the safety of ingesting kava with water.  TT at 68:12–13; Pl. Ex. 7.  The Dentali Report disregarded the 2020 Memo as an "unscientific regulatory opinion" that "ignore[s] the well-established use of beverage kava."  Pl. Ex. 7 ¶ 11.  In his report. Dr. Dentali acknowledged that ingesting kava has been associated with liver injuries, but he asserts that "kava can be consumed with an acceptably low level of health risk" when "best practices" are followed.  *Id.* ¶¶ 13–15.  Although Dr. Dentali testified that the 2020 Memo conflates ingesting kava dietary supplements with ingesting kava steeped in water, the 2020 Memo actually discusses the safety of kava regardless of how it is consumed.  TT at 72:1–4, 72:24–73:1.

Dr. Dentali testified at trial that ingesting kava is "relatively safe when used in the traditional format," which involves preparation in cold water.  TT at 70:17–21.  Dr. Dentali never visited Plaintiffs' cafés nor discussed the cafés' production practices with the owners.  TT at 94:19–21, 95:3–4.  Despite having no first hand factual knowledge for his testimony, Dr. Dentali testified that Plaintiffs cold brew kava.  TT at 82:7–9.  Dr. Dentali acknowledged that he was simply assuming that Plaintiffs were using a cold water extract based on pictures of Plaintiffs' process of preparing kava and their statements on their website that they used traditional methods.  TT at 83:22–84:1.[9]

---

[9]    His assumption appeared to have been influenced as well by the fact that his stepdaughter worked at a kava bar in Florida.  TT at 82:10-18.

Dr. Craig Llewellyn has a Ph.D. in pharmacology and toxicology and produced a report ("Llewellyn Report") on the "regulatory aspects associated with [the] sale and consumption of kava . . . as a prepared tea-type ready to drink beverage." Pl. Ex. 8. In his report, Dr. Llewellyn noted that the "FDA considers nonmodified plant components . . . when mixed with water and served as a ready-to-drink beverage as 'food' and not as a food additive or a GRAS substance," thereby concluding that kava mixed with water is a food. *Id.* at 1. The Llewellyn Report stated that the "FDA has indicated that [k]ava derived ingredients . . . are not eligible to be classified as a food additive or GRAS substance." *Id.* at 2. It also stated, however, apparently relying on the 2020 Memo, that "FDA communications have not stated that [k]ava is not a food" when consumed as a tea-type beverage. *Id.* At trial, when the Court asked Dr. Llewellyn to specify where in the 2020 Memo FDA stated that kava or kava derived ingredients are not food additives, he admitted that the 2020 Memo "does not directly say that." TT at 107:21–23. Dr. Llewellyn acknowledged that kava is not GRAS and that it "cannot be approved as a food additive because the FDA has safety concerns." TT at 108:9, 14–15.

## II.    CONCLUSIONS OF LAW

### A.    Legal Standard

Plaintiffs bear the burden to prove their claims by a preponderance of the evidence. *See Velasquez v. U.S. Postal Serv.*, 155 F. Supp. 3d 218, 227 (E.D.N.Y. 2016). A preponderance of evidence exists if "the trier of fact believe[s] that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993)). Under that standard, the party with the burden of proof loses if the evidence is in equipoise. *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001);

*see United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses.").

It is within the province of the district court, serving as the trier of fact in a bench trial, to decide whose testimony to believe. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). As the trier of fact, the judge is entitled, "just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Id.* (internal quotations and citations omitted). Similarly, "the weight to be given to particular pieces of evidence" is "peculiarly within the province of the [judge as] trier of fact" and these determinations are "entitled to considerable deference." *Cont'l Ins. Co. v. Lone Eagle Shipping Ltd. (Liber.)*, 134 F.3d 103, 104 (2d Cir. 1998) (citation omitted).

### B. The FDCA Regulatory Framework

"Food" is defined in the FDCA as "(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article." 21 U.S.C. § 321(f). Foods are presumed safe. Sen. Rep. 103–410 at 21 (1994) ("Under present law . . . any food, is presumed to be safe."). A "food additive" is defined as "any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food . . . if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use[.]" 21 U.S.C. § 321(s). Thus, unlike a "food," a "food additive" is not presumed safe.

### C.  Plaintiffs Failed to Prove that Kava Steeped in Water is Food

It was Plaintiffs' burden to prove, by a preponderance of the evidence, that under the FDCA kava steeped in water is a "food."  Plaintiffs failed to meet their burden.

Although the Department of Health has the authority to determine what constitutes an adulterant under N.Y.C. Health Code § 71.05(c), it does so by embracing the FDCA.  Thus, under city law, food is adulterated if it "is unsafe within the meaning of the [FDCA]."  N.Y.C. Health Code § 71.05(c)(2).  There are no arguments regarding preemption; Defendants concede that their position hangs entirely on whether, under the FDCA, kava is a food additive when added to water.  Zilkha Decl. Ex. B at 6:23–25, Dkt. 80–2.  On the other side, Plaintiffs do not dispute that, because kava has never been designated as GRAS, kava steeped in water and sold as a beverage can be prohibited under N.Y.C. Health Code § 71.05(a) if kava is a food additive when steeped in water.  *Id.* at 4:13–16.  Thus, Plaintiffs are entitled to judgment in their favor if it is more likely than not that the FDA views kava in water as a food, and Defendants are entitled to judgment in their favor if it is more likely than not that the FDA views kava in water as a food additive *or* if the credible evidence is in equipoise.

Both parties contend that the FDA supports their position.  Plaintiffs hinge their argument on one email chain that a single FDA regional branch director sent to Schiff, the Deputy Commissioner of the Department of Health, in 2024, and the opinions of two purported experts.  Pl. Exs. 5, 7–8.  Defendants, in contrast, base their position on the 2020 Memo, which the agency published and is available to the public on the FDA's website.[10]  Def. Ex. 1.

---

[10]  *Review of the published literature pertaining to the safety of Kava for use in conventional foods*, U.S. Food & Drug Administration, https://www.fda.gov/media/169556/download?attachment#:%7E:text=The%20memorandum%20discusses%20kava %20root,with%20food%20uses%20of%20kava (last visited Aug. 6, 2025).

Plaintiffs urge the Court to rely on the FDA Email as stating the official FDA position and to disregard the 2020 Memo [11] as an "unscientific regulatory opinion." Pl. Ex. 7 ¶ 11. In the FDA Email, which consists of a series of casual communications that were not publicly released, O'Malley, an FDA regional office employee, represented that she was communicating the "FDA's current thinking on Kava." Pl. Ex. 5 at 1. Plaintiffs did not call O'Malley as a witness, so precisely with whom she consulted (or what that person's expertise was) before sending the email is unknown. In all events, O'Malley's email is anything but clear. For example, she wrote:

> Kava is not approved for use in food as a food additive. Kava-containing products contain kavalactones, which at high levels have been associated with liver-related injuries – including hepatitis, cirrhosis, and liver failure. Given the safety concerns associated with kava, we do not consider its use in food to be GRAS. Food that contains an unapproved food additive is adulterated under the FD&C Act.

Pl. Ex. 5 at 2. But she also wrote in the same email:

> Please note that kava steeped in water to brew tea would generally not be regulated as a food additive - if it is only steeped in water and consumed as a single-ingredient it is considered a conventional food. However, such use may present safety concerns. Food that contains a substance that may render it injurious to health is adulterated under the FD&C Act.

*Id.* In a later email that is part of the FDA Email string, O'Malley wrote:

> No use of kava or its derivatives has been approved as a food additive. We do not consider its use in food to be GRAS, nor are we aware of a basis to conclude any use of kava or its derivatives in conventional food is otherwise excepted from the

---

[11]    Plaintiffs argue that Defendants' reliance on the 2020 Memo is "fatal" to their defense because the memo does not address whether kava steeped in water is a food additive. Pl. Mem. at 2. They contend that the title of the 2020 Memo illustrates the "illogical nature" of Defendants' argument that kava mixed with water is a food additive. *Id.* n.2. The 2020 Memo is titled, "Review of the published literature pertaining to the safety of Kava for use in conventional foods." Def. Ex. 1. Plaintiffs argue that because the 2020 Memo states that "the use of kava as an ingredient in conventional foods is [not] GRAS," *id.* at 21, and the FDA Email stated that kava mixed with water is a "conventional food," Pl. Ex. 5 at 2, it defies logic for Defendants to argue that the 2020 Memo addressed kava mixed with water because kava with water is a conventional food. Pl. Mem. at 2 n.2. The Court does not find Plaintiffs' argument to be persuasive.

food additive definition in the FD&C Act. Food that contains an unapproved food additive is adulterated under the FD&C Act.

*Id.* at 4. But then she wrote in the same email:

> I know there has been some confusion about whether the FDA would consider kava used as a single ingredient in tea as a food additive. If kava is steeped in water to brew tea it would not be considered a food additive, however, we still would NOT consider it safe. We did some digging into menus and rarely do we even see it served that way . . . usually other ingredients are added (to improve the taste??). I think if kava is steeped in water to make tea and then served with any sugar/flavor/literally anything else, it could be considered back in the unsafe food additive territory.

*Id.* at 4–5. In the email, O'Malley never explained why kava would be considered a food additive if added to milk or added to honey-sweetened water but is not considered a food additive if added to pure water with no sweetener. And, as noted, Plaintiffs did not present her or anyone else from the FDA as a witness so those questions could be answered.

Plaintiffs argue that the FDA Email is a paragon of clarity and that Defendants were unable to "undermin[e], much less put[] even the smallest crack in, the clear and well supported FDA guidance that kava steeped in water is a conventional food, and not a food additive." Pl. Mem. at 3. The Court does not share Plaintiffs' view.

Schiff, who was the recipient of the FDA Email, testified that she reached out to O'Malley "seeking guidance about kava being used by food service establishments." TT at 39:20–21. O'Malley's response indicated that the Retail Food Specialist assigned to New York City had reached out to the FDA's Retail Food Specialists to gather information on how other jurisdictions regulate kava. Pl. Ex. 5 at 1. Plaintiffs' cafés are not "retail food establishments;" they are food service establishments.[12] That disconnect means that even if the FDA Email were clear, there may have been an underlying misunderstanding of what Schiff was asking.

---

[12]    Schiff testified that retail food establishments are markets, like grocery stores or bodegas, where "the food is typically packaged, it has a label, the consumer prepares the food themselves," whereas food service

Putting aside whether O'Malley fully understood the question being asked, Schiff testified credibly that she found O'Malley's statements as "clear-as-mud," TT at 43:17, and that O'Malley's use of the word "tea" (which is not a regulatory word) was "imprecise." TT at 38:15–21. Schiff did not consider the FDA Email "to be determinative," as O'Malley stated that the FDA "would NOT consider [kava] safe." TT at 39:9–12. Under the FDCA, "food" is presumed to be safe, whereas "food additives" that are not GRAS are "deemed to be unsafe" for public consumption until "a regulation [is] issued . . . prescribing the conditions under which such additive may be safely used." 21 U.S.C. § 348(a)(2). Under this framework, the FDA Email becomes even more inscrutable, as O'Malley wrote that "kava when steeped only in water IS a food," Pl. Ex. 5 at 1, and yet she also wrote that kava steeped in water is "NOT consider[ed] safe" by the FDA, *id.* at 5 (emphasis in original). For those reasons, the Court finds that the FDA Email is not persuasive on the key issue in this case.

In a further effort to satisfy their burden of proof, Plaintiffs directed the Court to two out-of-circuit cases that O'Malley had mentioned in the FDA Email: *United States v. Two Plastic Drums, More or Less of an Article of Food, Labeled in Part: Viponte Ltd. Black Currant Oil Batch No. BOOSF 039, etc., and Traco Labs, Inc.*, 984 F.2d 814 (7th Cir. 1993), and *United States v. 29 Cartons of *** An Article of Food, etc.*, 987 F.2d 33 (1st Cir. 1993). Pl. Ex. 5 at 1. Neither of those cases deal with kava or any other product being sold after being steeped in water, nor are they binding authority in this circuit. Both cases dealt with black currant oil ("BCO") that was sold in capsules. The FDA argued the BCO was a food additive because it became a "component" of food when encapsulated with gelatin and glycerin for sale as a capsule. *Two Plastic Drums*, 984 F.2d at 816; *29 Cartons*, 987 F.2d at 35. In *Two Plastic*

---

establishments "are like a restaurant." TT at 25:4–9.

*Drums*, the Seventh Circuit rejected the FDA's position and held that "although a component of food is generally a food additive, when the 'component' is the single active ingredient and thus in all material respects is identical to the food of which it is supposedly a component but for certain inactive additions, such as the gelatin and glycerin used for encapsulation . . ., the substance in question is not a food additive." *Id.* at 819–20.  Similarly in *29 Cartons*, the First Circuit held that arguing "that placing a single-ingredient food product into an inert capsule as a convenient method of ingestion [*i.e.* gelatin and glycerin] converts that food into a food additive perverts the [FDCA]."  987 F.2d at 39.  Plaintiffs contend that those cases require this Court to determine that kava steeped in water is a single ingredient food that is mixed with water for ease of consumption.  Pl. Mem. at 9.

Plaintiffs do not address *Nat'l Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377 (2d Cir. 1978), a case cited by Defendants, Def. Mem. at 11, Dkt. 81, in which the Second Circuit, in a different context but dealing with the same statute, dealt with the argument that, "in the nature of things, a 'food' cannot be a 'food additive.'"  572 F.2d at 391.  The Circuit disagreed.  As the Fifth Circuit had noted previously, "[t]he sole criterion for identifying a food additive is whether a substance which may become a component of or affect the characteristics of any food be not generally recognized among qualified experts as having been shown to be safe."  *United States v. 41 Cases More or Less, etc., et al.*, 420 F.2d 1126, 1131 (5th Cir. 1970).  Consistent with that notion, the Second Circuit held that a substance does not escape the "food additive" definition just because it may also qualify as a food.  572 F.2d at 391.

Kava added to water affects the characteristics of the water.  It changes the appearance of water from a clear liquid to a "tan-ish, brown-ish" liquid, TT at 113:13–14, and it changes the chemical composition of water from $H_2O$ to a liquid that includes kavalactones, chemicals that

have hepatotoxic properties, 2020 Memo at 3–4, 11–12.  No one can seriously dispute, then, that kava "affect[s] the characteristics" of water, rendering kava a "food additive" under the FDCA when steeped in water.  *See Nat'l Nutritional,* 572 F.2d at 391; *41 Cases More or Less*, 420 F.2d at 1131.

In addition to its unpersuasive arguments based on the FDA Email and the BCO cases, Plaintiff relied on the testimony of two experts to prove that whether FDA views kava in water to be a food or a food additive, it is safe as Plaintiffs sell it.

Dr. Dentali was retained to "focus on the safety of traditional kava beverages."  TT at 69:12–13.  He admitted that his stepdaughter worked for a different kava bar, which diminishes his credibility as a neutral expert.  TT at 82:12–18.  He testified that kava is "relatively safe when used in the traditional format and in the regular way [*i.e.* steeped in cold water]."  TT at 70:17–19.  Dr. Dentali admitted that he qualified his opinion that kava is safe by saying it is "relatively safe" based in part on the "FDA's conclusion that indiscriminate use of kava as a beverage is not safe for human consumption."  TT at 71:8–13.  He testified that the "traditional[]" preparation involved kava being steeped in cold water.  TT at 69:15–16.  When the Court asked Dr. Dentali for the basis of his premise that Plaintiffs prepare cold water extracts, he stated that he knew it from "reviewing [Plaintiffs'] website and reviewing the products and reviewing images that people had posted on the website – on Google Maps or whatever."  TT at 82:21–24.  The Court probed how Dr. Dentali was able to ascertain from the pictures that the beverage was cold brewed, and he admitted that he was just assuming Plaintiffs did so because (1) that is the traditional preparation and (2) people in the images were using their bare hands to squeeze cloth bags.  TT at 82:21–22, 83:9–84:1.  Dr. Dentali did not visit either of Plaintiffs' cafés.  TT at 94:19–21.  He participated in a conference call with Dylan Harrison, the owner of Plaintiffs'

cafés, but he had no recollection whether he discussed Plaintiffs' production methods on that call.  TT at 94:22–95:4. [13]

Dr. Dentali's conclusions are not persuasive to the Court because they are based on assumptions about Plaintiffs' business practices that he failed to confirm and that Plaintiffs failed to prove.

Dr. Llewellyn, who has no prior experience with kava and has only seen pictures of kava infused in water, was "retained to be an expert associated with the FDA regulatory status of Kava infused waters as a tea."  TT at 100:17–18.  In preparing his expert report, Dr. Llewellyn reviewed publicly available information from the FDA, USDA, and the DEA associated with kava, as well as a documents on the history of use and kava consumption from the International Kava Organization, a trade organization.  TT at 101:25–102:3, 102:17–23.  Although Dr. Llewellyn testified that the FDA has taken the position that kava is not a food additive, he admitted when pressed that the 2020 Memo on which he was relying for that testimony "does not directly say that." TT at 107:17–23.  Ultimately, Dr. Llewellyn acknowledged that the 2020 Memo did not address whether kava in water was a food additive and acknowledged that the 2020 Memo did say that kava could not be approved as a food additive.  TT at 108:25-109:24.  Dr. Llewellyn testified that he did not find "any FDA action against a tea-type beverage produced from water infusion of kava" but he also admitted that he has not communicated with the FDA regarding its position on kava.  TT at 112:12–14, 115:24.

Neither of Plaintiffs' experts moved the needle in convincing the Court that it is more likely than not that kava steeped in water is a single ingredient food or that it is safe to ingest.

---

[13]     Dylan Harrison did not testify at trial.  TT at 3:4–8.  Although his deposition was admitted into evidence, the method his cafés used to prepare kava was not discussed during the deposition.

Because Plaintiffs have not proven by a preponderance of the evidence that kava steeped in water is a food rather than a food additive or that it is safe,[14] it is not entitled to a declaratory judgment that kava is a single ingredient food when steeped in water.[15]

### D.  Plaintiffs Failed to Prove that Defendants Violated Their Due Process Rights

Plaintiffs also brought a claim pursuant to 42 U.S.C. § 1983 for an alleged deprivation of their Fourteenth Amendment rights to due process based on the fact that the Department of Health issued Closing Orders without any pre-deprivation process.  Pl. Mem. at 12–15.  They contend that the Closing Orders were not justified to protect the health or safety of the public, as the Department of Health can only order the closure of a food service establishment "if continued operation is an imminent hazard to the public health."  *Id*. at 14 (citing N.Y.C. Health Code § 81.39).  Plaintiffs argue that neither Schiff nor Robinson were able to pinpoint an imminent health threat and point out that the City has not taken any enforcement action related to the sale of kava as a dietary supplement or packaged in a tea bag.  *Id.* (citing TT at 28:16–21; 29:23–30:2; 142:5–10).  Moreover, Plaintiffs argue that repeatedly issuing summons and Closing Orders despite the determinations of OATH Administrative Law Judges ("ALJs") that Plaintiffs were not selling kava as a food additive constitutes an abuse of discretion.  *Id.*

"The two threshold questions in any [Section] 1983 claim for denial of procedural due process are whether the plaintiff possessed a liberty or property interest protected

---

[14]    This opinion only addresses the discreet question before the Court: whether Plaintiffs have proven that kava mixed with water is a food and thus presumed safe.  The Court has no opinion on the safety *vel non* of kava as a dietary supplement or whether under federal law kava can legally be sold packaged as a dry material in tea bags.

[15]    Because Plaintiffs did not prevail on the merits, they are obviously not entitled to an injunction preventing Defendants from restricting, interfering or preventing their sale of kava mixed with water.  *Salinger v. Colting*, 607 F.3d 68, 77 (2d Cir. 2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (to be entitled to a permanent injunction, Plaintiffs must show, *inter alia*, actual success on the merits)).

by the United States Constitution or federal statutes, and, if so, what process was due before plaintiff could be deprived of that interest." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)); *see also Hynes v. Squillance*, 143 F.3d 653, 658 (2d Cir. 1998) (holding that to state a procedural due process claim, a plaintiff must "demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process"). When the government deprives a plaintiff of a property interest pursuant to an established procedure, procedural due process is generally satisfied so long as some form of hearing is provided before the individual is deprived of the property interest. *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011). Although the "general rule" is that a hearing is required pre-deprivation, post-deprivation process can also be constitutionally sufficient. *Id.* at 158–59; *see also Spinelli v. City of N.Y.*, 579 F.3d 160, 170 (2d Cir. 2009).

Plaintiffs' due process claim fails at the first step because Plaintiffs have not established that they have a protectable property right to sell kava in violation of municipal or state law. *See 689 Eatery Corp. v. City of N.Y.*, 716 F. Supp. 3d 88, 203 (S.D.N.Y. 2024) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)) ("Property rights . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."). *See also B.R.-S.O.H. LLC v. City of Detroit*, No. 17-11093, 2019 WL 2949501, at *6 (E.D. Mich. Apr. 3, 2019) ("What Plaintiffs fail to appreciate, however, is that they had no due process right to operate medical marijuana dispensaries in violation of state law."). Plaintiffs claim that kava mixed with water is their "primary product," Pl. Mem. at 12, and that they have "a property and liberty interest in selling Kava as a single ingredient food . . .

mixed with water," Am. Compl. ¶ 37.  That is incorrect; selling kava mixed with water violates

N.Y.C. Health Code § 71.05 because it is an adulterated food. [16]  *See* Def. Exs. 7–8.

Plaintiffs base part of their claim on the fact that OATH ALJs found that Plaintiffs were

not selling kava as a food additive, but they ignore the fact that each of those determinations was

subsequently overturned on appeal.  *See* Def. Exs. 11–12.  Plaintiffs had no protectable interest

that rose to the level of entitlement to being free from enforcement of a generally applicable

municipal regulation that prohibits the sale of adulterated food.

Although the lack of a protectable property interest is fatal to Plaintiffs' due process

claim, even if they did have a protectable property interest, their claim would still fail because

Plaintiffs were afforded meaningful post-deprivation process.  The Supreme Court has held that

although "due process ordinarily requires an opportunity for 'some kind of hearing' prior to the

deprivation of a significant property interest," "summary administrative action may be justified

in emergency situations."  *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.* 452 U.S. 264,

299–300 (1981) (citations omitted).  "Protection of the health and safety of the public is a

paramount governmental interest which justifies summary administrative action."  *Id.* at 300.

Although summary action taken in an "abusive and arbitrary manner" is not permitted, the law

does not "discourage officials from taking prompt action to insure the public safety."  *Cantazaro*

*v. Weiden*, 188 F.3d 56, 62–63 (2d Cir. 1998).

The Department of Health issued Closing Orders to Kavasutra 6th Street on July 13 and

September 19, 2023, and a Closing Order to Kavasutra 10th Street on January 11 and July 12,

2023, because Plaintiffs were serving kava in water in violation of N.Y.C. Health Code § 71.05.

---

[16]     As stated in note 7, *supra*, food that contains a food additive is adulterated if it is unsafe as defined by the
FDCA.  The FDCA, as discussed *supra* at page 11, views food additives as safe only if they are GRAS.  The parties
agree that kava is not GRAS.  Zilkha Decl. Ex. B at 4:11–17.

Def. Exs. 13–14.  As noted *supra*, Defendants' enforcement actions were based on their interpretation of the 2020 Memo, which stated that "indiscriminate use of kava . . . is not safe for human consumption."  Def. Ex. 1 at 21.  Plaintiffs continued to operate in violation of the Closing Orders.  TT at 133:9–11.  Plaintiffs were undoubtedly afforded meaningful post-deprivation process, of which they availed themselves.  Plaintiffs appeared at OATH for hearings on summons issued on March 2, July 28, August 24, and October 4, 2023, pertaining to the two cafés.  Def. Exs. 9, 10.  Although OATH initially ruled in Plaintiffs' favor, those decisions were appealed by Defendants and reversed by the OATH Appeals Board.  Def. Exs. 11–12.  Plaintiffs have not proven that any aspect of the OATH hearings was constitutionally deficient; instead, Plaintiffs argue that the OATH decisions were correct and completely ignore the fact that the OATH Appeals Board overturned each of the decisions on which Plaintiffs rely.  Plaintiffs take issue with the fact that the Department of Health has never taken action against the sale of kava as a dietary supplement or kava that is packaged in tea bags, Pl. Mem. at 14, but that is irrelevant.  Regulations pertaining to dietary supplements differ considerably from food regulations, and the status of kava packaged in a tea bag and sold at a grocery store is not the same as the status of kava mixed with water and sold by a restaurant.  Finally, Plaintiffs' assertion that there was no imminent harm to public safety because kava is safe is contrary to the views of the FDA as expressed in the 2020 Memo and in the FDA Email.

For the reasons discussed, the administrative proceedings afforded to Plaintiffs were constitutionally adequate and appropriately guarded against the erroneous deprivation of their rights.  Accordingly, the Court finds in favor of Defendants on Plaintiffs' Section 1983 claim.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendants on Plaintiffs' declaratory judgment, permanent injunction, and Section 1983 claims.  Because the Court has denied Plaintiffs' Section 1983 claim, it also denies Plaintiffs' request for attorneys' fees and costs under 42 U.S.C. § 1988.

The Court of Clerk is respectfully directed to terminate any open motions, enter judgment for Defendants, and close the case.

**SO ORDERED.**

**Dated:    August 7, 2025**
**         New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**